# In the United States Court of Appeals for the Eighth Circuit

---

MMIC Insurance Inc.,
*Plaintiff-Appellee,*

v.

Obstetric and Gynecologic Associates of
Iowa City and Coralville, P.C.,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Southern District of Iowa (Eastern)
Case No. 3:23-cv-00039-SMR-WPK (The Hon. Stephanie M. Rose)

---

## OPENING BRIEF OF DEFENDANT-APPELLANT OBSTETRIC AND GYNECOLOGIC ASSOCIATES OF IOWA CITY AND CORALVILLE

---

Nicholas C. Rowley
Dominic Pechota
Clinton Ehrlich
Trial Lawyers For Justice
421 West Water Street
Decorah, IA 52101
(563) 382-5071

Deepak Gupta
Jonathan E. Taylor
Gregory A. Beck
Gupta Wessler LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
*deepak@guptawessler.com*

February 6, 2026                    *Counsel for Defendant-Appellant*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

In this case, insurance company MMIC persuaded the district court to issue a declaratory judgment that voids a medical clinic's liability policy, leaving the clinic holding the bag on the largest medical-malpractice judgment in Iowa history. After its lawyers' defense of the clinic ended in a $97 million verdict, MMIC refused even to discuss settlement—insisting instead that it would roll the dice on a direct appeal to the Iowa Supreme Court. The company had every incentive to take that risk, since it was gambling with the medical clinic's money. With its liability capped at a fraction of the total verdict by a $12 million policy limit, MMIC had nothing to lose and everything to gain by even a small chance of reversal. The clinic, on the other hand, faced crushing liability and enormous risk on appeal. It wanted to settle, but the lawyers hired by MMIC—facing conflicted loyalties—wouldn't even try.

When the clinic hired its own counsel to explore settlement, MMIC ran to federal court seeking to void the entire policy. The court agreed, holding that the clinic's tentative settlement attempts were not based on "a legitimate concern about representation," but a "deliberate attempt to obstruct the appellate process." That holding, which depends on inferences wrongly drawn against the clinic on summary judgment, requires reversal. The court failed to identify a material breach of any policy language, much less a prejudicial one, and its extreme remedy was unjustified.

The clinic requests 30 minutes of oral argument time to address these issues.

i

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Obstetric and Gynecologic Associates of Iowa City and Coralville, P.C., does not have a parent corporation and no publicly held corporation owns 10% or more of its stock.


February 6, 2026                    */s/ Deepak Gupta*
                                    DEEPAK GUPTA

ii

# TABLE OF CONTENTS

Summary of the case and request for oral argument.................................................. i

Rule 26.1 disclosure statement ...................................................................... ii

Table of authorities ................................................................................. v

Introduction ........................................................................................ 1

Jurisdictional statement ............................................................................ 4

Statement of the issue .............................................................................. 4

Statement of the case .............................................................................. 4

    A.    Legal background ............................................................................ 4

    B.    Factual background ......................................................................... 9

        1.    After refusing to settle within the policy limit, MMIC loses at trial—leaving the clinic with historic liability ............... 9

        2.    On appeal, MMIC refuses to negotiate or post a bond to protect the clinic's assets, choosing instead to push the clinic to file for bankruptcy ..................................... 11

        3.    After a confidential mediation raises the possibility of settlement between the clinic and S.K., MMIC rushes to federal court to stop it ............................................ 13

        4.    With MMIC still refusing to negotiate settlement, the clinic sues the insurance company and its lawyers for their bad-faith failure to settle, and separately moves to protect its rights in the Iowa Supreme Court .......................... 15

        5.    MMIC interferes with the clinic's settlement attempts and moves for summary judgment. ........................................ 17

        6.    MMIC prevails on appeal in the Iowa Supreme Court and on summary judgment in the district court ...................... 18

Summary of argument .............................................................................. 21

Standard of review ................................................................24

Argument ...............................................................................24

    I.    The clinic did not materially breach the policy by temporarily withdrawing its consent to legal representation—much less did it cause actual prejudice to MMIC in doing so ...................................25

    II.    The clinic did not materially breach the policy by engaging in nonbinding settlement discussions, nor was MMIC prejudiced by those discussions ....................................................................35

    III.    The clinic did not materially breach the cooperation clause or thereby prejudice MMIC ....................................................39

    IV.    The district court erred by adopting the extreme remedy of voiding the clinic's entire policy ..........................................47

Conclusion ...........................................................................51

Appellate Case: 25-1758    Page: 5    Date Filed: 02/09/2026 Entry ID: 5606188

# TABLE OF AUTHORITIES

## Cases

*Alta Vista Properties, LLC v. Mauer Vision Center, PC,*
855 N.W.2d 722 (Iowa 2014) ................................................................. 36

*American Guarantee & Liability Insurance Co. v. Chandler Manufacturing Co.,*
467 N.W.2d 226 (Iowa 1991) ................................................................ 40

*American Family Mutual Insurance Co. v. Corrigan,*
697 N.W.2d 108 (Iowa 2005) .................................................... 26, 36, 47

*Amish Connection, Inc. v. State Farm Fire & Casualty Co.,*
861 N.W.2d 230 (Iowa 2015) ................................................................ 26

*Arena Holdings Charitable, LLC v. Harman Professional Inc.,*
785 F.3d 292 (8th Cir. 2015) ......................................................... 24, 30

*Ballinger v. Culotta,*
322 F.3d 546 (8th Cir. 2003) ................................................................ 42

*Bottoms v. Stapleton,*
706 N.W.2d 411 (Iowa 2005) ............................................................... 29

*Bradley v. West Bend Mutual Insurance Co.,*
796 N.W.2d 455 (2003) ....................................................................... 40

*Brandon v. West Bend Mutual Insurance Co.,*
681 N.W.2d 633 (Iowa 2004) ............................................................... 43

*Bruns v. Hartford Accident & Indemnity Co.,*
407 N.W.2d 576 (Iowa 1987) ............................................................... 42

*Chandler v. Iowa Department of Corrections,*
17 N.W.3d 645 (Iowa 2025) ................................................................. 36

*Charter Oak Fire Insurance Co. v. Color Converting Industries Co.,*
45 F.3d 1170 (7th Cir. 1995) .................................................................. 5

*DeWaay v. Muhr,*
160 N.W.2d 454 (Iowa 1968) ............................................................... 49

Appellate Case: 25-1758    Page: 6    Date Filed: 02/09/2026 Entry ID: 5606188

*Dolly Investments, LLC v. MMG Sioux City, LLC,*
    984 N.W.2d 168 (Iowa 2023) ................................................... 4, 50, 51

*Fireman's Fund Insurance Co. v. ACC Chemical Co.,*
    538 N.W.2d 259 (Iowa 1995) ................................................... 35, 42

*First Colony Life Insurance Co. v. Berube,*
    130 F.3d 827 (8th Cir. 1997) ................................................... 24

*Flexi-Van Leasing, Inc. v. Travelers Indemnity Co.,*
    837 F. App'x 141 (4th Cir. 2020) ................................................... 50

*Grinnell Mutual Reinsurance Co. v. Jungling,*
    654 N.W.2d 530 (Iowa 2002) ................................................... 26

*Henderson v. Hawkeye-Security Insurance Co.,*
    106 N.W.2d 86 (1960) ................................................... 33

*Henderson v. United States,*
    815 F.2d 1189 (8th Cir. 1987) ................................................... 43

*Henke v. Iowa Home Mutual Casualty Co.,*
    87 N.W.2d 920 (Iowa 1958) ................................................... passim

*Henke v. Iowa Home Mutual Casulty Co.,*
    97 N.W.2d 168 (Iowa 1959) ................................................... 8, 9

*Homolla v. Gluck,*
    248 F.2d 731 (8th Cir. 1957) ................................................... 30

*Horton by Horton v. City of Santa Maria,*
    915 F.3d 592 (9th Cir. 2019) ................................................... 24

*In re Grand Jury Subpoena GJ2/00-345,*
    132 F. Supp. 2d 776 (S.D. Iowa 2000) ................................................... 43

*Johnson v. Wells Fargo Bank, N.A.,*
    744 F.3d 539 (8th Cir. 2014) ................................................... 31, 47

*Kelly v. Iowa Mutual Insurance Co.,*
    620 N.W.2d 637 (Iowa 2000) ................................................... passim

*Kibbee v. State Farm Fire & Casualty Co.,*
    525 N.W.2d 866 (Iowa 1994) ................................................... 26

vi

*Kooyman v. Farm Bureau Mutual Insurance Co.*,
315 N.W.2d 30 (Iowa 1982)...............................................................6, 8, 9

*Lane v. Crescent Beach Lodge & Resort, Inc.*,
199 N.W.2d 78 (Iowa 1972) ...............................................................48

*McAndrews v. Farm Bureau Mutual Insurance Co.*,
349 N.W.2d 117 (Iowa 1984) ..............................................................41

*McClune v. Farmers Insurance Co., Inc.*,
12 F.4th 845 (8th Cir. 2021).............................................................45

*Met-Coil Systems Corp. v. Columbia Casualty Co.*,
524 N.W.2d 650 (Iowa 1994) ..............................................................33

*Michigan Millers Mutual Insurance Co. v. Asoyia, Inc.*,
2014 WL 11513162 (S.D. Iowa 2014) .................................................38, 43

*Michigan Millers Mutual Insurance Co. v. Asoyia, Inc.*,
793 F.3d 872 (8th Cir. 2015)..........................................................34, 35

*Midland Mutual Life Insurance v. Mercy Clinics*,
579 N.W.2d 823 (Iowa 1998)...........................................................48, 49

*Padden Law Firm, PLLC v. Toyota Motor Corp.*,
956 F.3d 1069 (8th Cir. 2020) ...........................................................27

*Parker v. Iowa Mutual Tornado Insurance Association*,
260 N.W. 844 (1935)......................................................................48

*Plummer v. McSweeney*,
941 F.3d 341 (8th Cir. 2019) ............................................................27

*Royal Indemnity Co. v. Factory Mutual Insurance Co.*,
786 N.W.2d 839 (Iowa 2010) ..............................................................46

*Ryan Data Exchange, Limited v. Graco, Inc.*,
913 F.3d 726 (8th Cir. 2019)............................................................32

*Salier v. Walmart, Inc.*,
76 F.4th 796 (8th Cir. 2023) ............................................................30

*Sargent v. Johnson*,
551 F.2d 221 (8th Cir. 1977)............................................................38

Appellate Case: 25-1758    Page: 8    Date Filed: 02/09/2026 Entry ID: 5606188

*Simpson v. U.S. Fidelity and Guaranty Co.*,
    562 N.W.2d 627 (Iowa 1997) ........................................................ 38, 42

*Torgerson v. City of Rochester*,
    643 F.3d 1031 (8th Cir. 2011) ................................................................ 47

*Union Story Trust & Savings Bank v. Sayer*,
    332 N.W.2d 316 (Iowa 1983) .................................................................. 48

*Van Oort Construction Co., Inc., v. Nuckoll's Concrete Service, Inc.*,
    599 N.W.2d 684 (Iowa 1999) ................................................................. 32

*Wierck v. Grinnell Mutual Reinsurance Co.*,
    456 N.W.2d 191 (Iowa 1990) ................................................................... 8

*Wunschel Law Firm, P.C. v. Clabaugh*,
    291 N.W.2d 331 (Iowa 1980) ................................................................. 27

## Other authorities

ABA Formal Opinion 96-403 (1996) ............................................. 6, 7, 8, 27

Bruce A. Ericson, 4 *Bus. & Com. Litig. Fed. Cts.* § 42 (5th ed. 2025) ............................. 7

Iowa Rules of Professional Conduct, Chapter 32 (2020) ................................... passim

ISBA Committee on Professional Ethics & Conduct,
    Formal Opinion 99-01 (1999) ............................................................. 6, 28

Thomas D. Morgan, *What Insurance Scholars Should Know About Professional
    Responsibility*, 4 Conn. Ins. L.J. 1 (1998) .................................................. 7

Stephen L. Pepper, *Applying the Fundamentals of Lawyers' Ethics to Insurance
    Defense Practice*, 4 Conn. Ins. L.J. 27 (1998) ................................... 6, 7, 27

Restatement (Second) of Contracts § 242 .................................................. 50

Restatement (Second) of Contracts § 344 .................................................. 48

Restatement (Third) of the Law Governing Lawyers § 134 ................................. 5, 7

D.R. Richmond, *Lost in the Eternal Triangle of Insurance Defense Ethics*,
    9 Geo. J. Leg. Ethics 475 (1996) ............................................................. 5

Appellate Case: 25-1758    Page: 9    Date Filed: 02/09/2026   Entry ID: 5606188

Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series:*
    *Lawyer and Judicial Ethics* § 5:7(d)(6) (2025). ................................................. passim

Appellate Case: 25-1758   Page: 10   Date Filed: 02/09/2026 Entry ID: 5606188

## INTRODUCTION

This case was brought by an insurance company seeking to escape its contractual responsibility for a record-setting verdict by retroactively stripping coverage from its insured. The insurance company, MMIC, exercised its right under the policy to control the defense of the underlying medical-malpractice case, with disastrous results. The insured medical clinic, Obstetric and Gynecologic Associates, repeatedly pleaded with MMIC to settle within the policy's $12 million limit. So did representatives of the plaintiff, a brain-damaged child. But MMIC steadfastly refused even to engage in settlement discussions. Instead, it insisted on taking the case to trial—and lost big. A state-court jury awarded $97 million, the largest medical-malpractice verdict in Iowa history.

That verdict, which far exceeded the clinic's policy limit even after the trial court reduced it to $76 million, exposed a structural conflict of interest for the lawyers whom MMIC had selected to defend the case. While the clinic's interest lay in settling within policy limits to avoid personal exposure, MMIC—shielded by the policy from additional liability—had every incentive to reject settlement and gamble on a direct appeal to the Iowa Supreme Court. So when MMIC still refused to settle on appeal, the clinic did what any rational party facing overwhelming liability and conflicted counsel would have done: It retained its own lawyer to explore the possibility of settlement on its behalf.

As soon as the clinic's new counsel attended a mediation on behalf of the clinic, however, MMIC rushed to federal court to block his involvement, demanding injunctive and declaratory relief against any "interference" with the Iowa Supreme Court's resolution of the appeal. The company's complaint soon proved unfounded. Although the Iowa Supreme Court briefly stayed the appeal to allow time for settlement talks, nothing ultimately came of those discussions. When no settlement was reached, the clinic moved to lift the stay, agreed to MMIC's preferred counsel, and ultimately prevailed in its appeal. MMIC, in short, got everything it wanted.

That should have been the end of the matter. But rather than dismissing MMIC's federal case, the district court granted it summary judgment and held the entire insurance policy void. The court held that—by temporarily delaying oral argument, participating in non-binding settlement discussions, and engaging in other conduct outside of the policy's scope (like bringing a separate bad-faith case against MMIC and dismissing a bankruptcy appeal)—the clinic had materially breached the contract "as a matter of law." Although the policy's plain language prohibited none of those things, and although the court identified no real-world prejudice to MMIC from the timing of oral argument or unconsummated settlement talks, the court granted the insurance company relief normally reserved for the most serious contract breaches—declaring the entire policy "void" and leaving the clinic without coverage for "[a]ny and all" claims brought against it.

That was error under state law. A district court's job in a diversity case like this one is to apply the law as it predicts the state's highest court would have applied it. But the court's holding here goes far beyond what the Iowa Supreme Court (or, to our knowledge, any court in the nation) has ever held. Although MMIC's policy terms are standard, neither it nor the district court cited a single decision finding a breach by an insured, or prejudice to an insurer, under anything close to the circumstances here. To the contrary, Iowa's case law and ethics rules make clear that—policy terms notwithstanding—an insured is not bound to follow the advice of counsel with divided loyalties, but remains free to appoint its own counsel and explore settlement on its own.

The district court's holding would be unsupportable in any posture, but is especially so on summary judgment. Unable to identify any breach of the policy's plain language, the court relied on its view that the "timing" of the clinic's actions suggested an intent "to disrupt the appeal process" rather than "a legitimate concern about representation." Add. 19; App. 249; R.Doc. 89, at 19. Even if the clinic's intent were relevant to the breach question (and it is not), the court was not free to draw that unfavorable inference—especially where an innocent explanation (that the clinic was rightly concerned about gambling its future on an appeal by conflicted counsel) is available. Contrary to the district court's view, there was nothing "suspicious" about the clinic's efforts to protect itself. This Court should reverse.

3

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction under 28 U.S.C. § 1332(a)(1) because the plaintiff, MMIC, is a corporation that is incorporated and with its principal place of business in Minnesota; the defendant, Obstetric and Gynecologic Associates, is a professional corporation that is incorporated and with its principal place of business in Iowa; and the amount in controversy exceeds $12 million. App. 15-16; R.Doc. 1, at 2-3. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291 because the district court entered a final judgment disposing of all parties' claims on March 31, 2025, from which the clinic filed a timely notice of appeal on April 14, 2025. App. 266; R.Doc. 91, at 1.

## STATEMENT OF THE ISSUE

Did the district court err in granting summary judgment to the plaintiff insurance company and declaring the insurance policy void and unenforceable based on alleged material breaches by the defendant insured?

*Henke v. Iowa Home Mutual Casualty Co.*, 87 N.W.2d 920 (Iowa 1958);
*Kelly v. Iowa Mutual Insurance Co.*, 620 N.W.2d 637 (Iowa 2000);
*Dolly Investments, LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 177 (Iowa 2023).

## STATEMENT OF THE CASE

### A.    Legal background

**1.**  "The triangular relationship among a liability insurance company, an insured, and the lawyer retained by the insurance company to defend[] the insured is ripe with possible conflicts of interest." 16 Gregory C. Sisk & Mark S. Cady, *Iowa*

4

*Practice Series: Lawyer and Judicial Ethics* § 5:7(d)(6) (2025). *See generally* D.R. Richmond, *Lost in the Eternal Triangle of Insurance Defense Ethics*, 9 Geo. J. Leg. Ethics 475 (1996). The Iowa Supreme Court explained nearly seventy years ago that "in almost every such case there is a potential conflict, … and, if and when it develops, that lawyer cannot and should not try to render further service or advice." *Henke v. Iowa Home Mut. Cas. Co.*, 87 N.W.2d 920, 925 (Iowa 1958).

A "[m]aterial divergence of interest might exist between a liability insurer and an insured, for example, when a claim substantially in excess of policy limits is asserted against an insured." Restatement (Third) of the Law Governing Lawyers § 134. In that case, "the insured may eagerly wish to settle for any amount within the policy limits" to avoid having "to dig into his or her own pockets to pay a judgment." 16 *Iowa Practice Series: Lawyer and Judicial Ethics* § 5:7(d)(6). "From the insurance company's standpoint," by contrast, "a proposed settlement for the full amount of the policy limits is financially indistinguishable from a judgment after trial for (or above) the full policy limits." *Id.* An insurer thus "might prefer to roll the dice and litigate with its insured's tort victim, knowing that its liability was capped at the policy limit and that if it was lucky and won the case it would not have to pay anything." *Charter Oak Fire Ins. Co. v. Color Converting Indus. Co.*, 45 F.3d 1170, 1173 (7th Cir. 1995) (Posner, J.).

When such a conflict arises, the "longstanding rule in Iowa" is that "the lawyer's duty of loyalty and attorney-client relationship lies with the insured." 16 *Iowa Practice Series: Lawyer and Judicial Ethics* § 5:7(d)(6) (citing Iowa Rs. Prof'l Cond. 32:1.7, 32:1.8(f), 32:5.4(c)); *see also* ISBA Comm. on Prof'l Ethics & Conduct, Formal Op. 99-01 (1999) ("[W]hen an insurer retains an attorney to represent an insured, the lawyer has an attorney-client relationship with the insured."). It is true that "a simultaneous relationship by the lawyer with the insurer continues as well, because the insurer both pays for the insurance defense and may be vicariously liable if the insured is held responsible in the underlying lawsuit." *Id.* That is why the contract typically "gives the insurer control over the settlement and trial, at least to the extent of its policy coverage." *Kooyman v. Farm Bureau Mut. Ins. Co.*, 315 N.W.2d 30, 32-33 (Iowa 1982). But "[w]hatever the rights and duties of the insurer and the insured under the insurance contract, that contract does not define the ethical responsibilities of the lawyer to his client." ABA Formal Op. 96-403 (1996).

For one thing, the insurance "contract is simply not binding upon the lawyer, a non-party." Stephen L. Pepper, *Applying the Fundamentals of Lawyers' Ethics to Insurance Defense Practice*, 4 Conn. Ins. L.J. 27, 38 (1998). For another, the "[i]nsured and insurance company agreement cannot change the public policy embodied in and enforced by" state ethics rules—including the rules governing conflicts of interest. *Id.* The insurance company therefore "may direct the lawyer if the insurance contract

6

so provides," but only "until there is a conflict of interest between insurer and insured." Thomas D. Morgan, *What Insurance Scholars Should Know About Professional Responsibility*, 4 Conn. Ins. L.J. 1, 12 (1998). Once "such a conflict exists or arises, the lawyer may not prefer the insurance carrier's interest over that of the insured." *Id.*

In particular, a lawyer "may not follow directions of the insurer if doing so would put the insured at significantly increased risk of liability in excess of the policy coverage." Restatement (Third) of the Law Governing Lawyers § 134. The lawyer has a duty "to protect the client from any judgment in excess of the policy limits." Bruce A. Ericson, 4 *Bus. & Com. Litig. Fed. Cts.* § 42:10 (5th ed. 2025). "If there is a significant possibility" of such a judgment, "then the insured's lawyer obviously must recommend settlement regardless of her assessment of the merits and likely outcome at trial." Pepper, *Applying the Fundamentals of Lawyers' Ethics to Insurance Defense Practice*, 4 Conn. Ins. L.J. at 52.

When "the insured and the insurer disagree as to whether a proposed settlement is acceptable" or "who has the right to decide that question under the insurance contract," the lawyer may be required to "consult with his client or clients as to the likely consequences of a proposed course of conduct or advise the parties to seek independent counsel." ABA Formal Op. 96-403; *see also* Restatement (Third) of the Law Governing Lawyers § 134 ("The lawyer should either withdraw or consult with the client-insured … when a substantial risk that the client-insured will not be

fully covered becomes apparent."). "Ultimately, however, although the insurer hires the lawyer and pays his fee, the insured retains the power to reject the defense offered by the insurer under the policy and to assume the risk and expense of his own defense." ABA Formal Op. 96-403; *see* Iowa R. Prof'l Cond. 32:1.2(a) ("A lawyer shall abide by a client's decision whether to settle a matter").

**2.** Like a lawyer, an insurance company also has a duty to protect the "rights of the [insured] in receiving the benefits of the agreement." *Kooyman*, 315 N.W.2d at 33. Where a policy provides that "the insurer controls the litigation," it "must give equal consideration to the interests of the insured as it does its own interests." *Henke v. Iowa Home Mut. Cas. Co.,* 97 N.W.2d 168, 173 (Iowa 1959).

That duty "includes a duty to settle claims without litigation in appropriate cases." *Kooyman*, 315 N.W.2d at 33. The Iowa Supreme Court has long recognized a cause of action against an insurance company that has "breached its duty of good faith by failing to settle a claim within policy limits." *Kelly v. Iowa Mut. Ins. Co.*, 620 N.W.2d 637, 643-44 (Iowa 2000). Although Iowa law does not mandate settlement whenever excess liability is possible, it "is bad faith for an insurance company to act irresponsibly in settlement negotiations with respect to the insured's risk" of an excess verdict, or "to factor in its consideration of settlement offers the limited amount between an offer and the policy limits." *Wierck v. Grinnell Mut. Reinsurance Co.*, 456 N.W.2d 191, 195 (Iowa 1990).

Appellate Case: 25-1758    Page: 18    Date Filed: 02/09/2026 Entry ID: 5606188

"When the insured and insurer differ on the desirability of settlement, the insurance company has a fiduciary obligation to the insured to fairly consider a settlement proposal." 16 *Iowa Practice Series: Lawyer and Judicial Ethics* § 5:7(d)(6). "Rejecting settlement proposals which the insurer knew to be reasonable, and which were within the policy limits, manifests bad faith towards the insured's interest." *Henke*, 97 N.W.2d at 173. Likewise, an "insurer's flat refusal to negotiate, under circumstances of substantial exposure to liability, a demonstrated receptive climate for settlement, and limited insurance coverage, may show lack of good faith." *Kooyman*, 315 N.W.2d at 37. If "the insurance company has breached the contract by wrongfully rejecting a reasonable settlement offer, the insured may accept the settlement offer over the insurer's objection without breaching policy duties and losing his right to seek coverage." *Kelly*, 620 N.W.2d at 639.

## B. Factual background

### 1. After refusing to settle within the policy limit, MMIC loses at trial—leaving the clinic with historic liability.

This case arose out of a medical-malpractice suit in Iowa state court against Obstetric and Gynecologic Associates, a medical clinic located in Johnson County. App. 56-57; R.Doc. 22-2, at 1-2. The plaintiff in that case, S.K. (a minor), sued the clinic (and other defendants who are no longer parties) through a conservator, alleging that a doctor's negligent use of a vacuum delivery device caused him severe brain damage and left him needing lifelong, full-time medical care. App. 57-59;

R.Doc. 22-2, at 2-4. The clinic denied liability and tendered the claim to its professional-liability insurer, MMIC, a Minnesota-based insurance company specializing in liability insurance for medical professionals. App. 48; App. 56; R.Doc. 22-2, at 1.

Like most insurance policies, MMIC's written policy gives it "the right to control the defense of" covered claims, including the right to "retain an attorney to defend any claim." App. 75; R.Doc. 22-3, at 12. The policy requires the clinic to "fully cooperate" with MMIC "in the investigation of claims, the negotiation of settlements, and the conduct of litigation." App. 72; R.Doc. 22-3, at 9. It also gives MMIC the right "to settle any claim," App. 75; R.Doc. 22-3, at 12, while prohibiting the insured—"except at the insured's own expense"—from "mak[ing] any payment, admit[ting] any liability or incur[ring] any obligation other than reasonable medical expenses," App. 72; R.Doc. 22-3, at 9. MMIC's settlement authority, however, is expressly subject "to the policyholder's right to consent." App. 75; R.Doc. 22-3, at 12. The policy provides that MMIC "will not settle a claim brought against an insured without the prior written consent of the policyholder," which "will not unreasonably be withheld." App 79; R.Doc. 22-3, at 16.

MMIC accordingly took charge of the clinic's defense against S.K.'s claims. App. 58; R.Doc. 22-2, at 3. Before trial, counsel for S.K. offered to settle in exchange for the policy limit of $12 million. App. 108; R.Doc. 22-3, at 74. But although both

S.K. and the clinic repeatedly requested that MMIC take that deal, and although the clinic "clearly faced potential exposure that far exceeded policy limits," the insurance company "refused to negotiate or make any settlement offer." Add. 31; App. 261; R.Doc. 89, at 31. Instead, MMIC forced the clinic to take the case to trial, and lost badly. A jury awarded more than $97 million in damages against the clinic for S.K.'s injuries—a record for medical-malpractice verdicts in the state. App. 197; R.Doc. 22-3, at 232. Even after the trial court reduced damages to $75.6 million, the award far exceeded the clinic's $12 million policy limit. Add. 3; App. 233; R.Doc. 89, at 3.

### 2. On appeal, MMIC refuses to negotiate or post a bond to protect the clinic's assets, choosing instead to push the clinic to file for bankruptcy.

The clinic filed a direct appeal to the Iowa Supreme Court, and MMIC selected attorney Troy Booher to enter his appearance on behalf of the clinic. *Id.* When MMIC reneged on its previous agreement to post a supersedeas bond during the appeal, which would have stayed efforts to collect the judgment, the clinic was left "vulnerable to execution proceedings during the pendency of the appeal." Add. 3; App. 233; R.Doc. 89, at 3. S.K. accordingly moved to execute on the judgment, and a sheriff arrived at the clinic to levy against its assets. Add. 25; App. 255; R.Doc. 89, at 25.

MMIC, still unwilling to settle, pushed to clinic to file for bankruptcy, offering it "financial advantages"—including payment of fees, favorable terms on insurance coverage, and an extension of credit—"in exchange for" using bankruptcy to "protect [MMIC] from making payment under the policy." App. 114; R.Doc. 22-3, at 80. The company warned that failure to go along with this plan would violate the policy's cooperation clause, voiding the policy and leaving the clinic without insurance coverage. App. 129-31, 147; R.Doc. 22-3, at 141-43, 161. The clinic, facing overwhelming liability and with no other option for survival, felt it had no choice but to agree. *See id.*

The bankruptcy court, however, refused to validate MMIC's scheme. The court found "[n]o satisfactory explanation … to justify MMIC's involvement in the bankruptcy case," including its "willingness to assist the [clinic] in paying for its bankruptcy"—a service that "appear[ed] to fall outside the policy terms." App. 114 n.49; R.Doc. 22-3, at 80 n.49. The "primary motivation" for the bankruptcy, the court concluded, "was to obtain the benefit of a stay to protect MMIC and the policy proceeds in the pending state court action." App. 113; R.Doc. 22-3, at 79. Accordingly, the court granted S.K.'s motion to dismiss the petition as having been filed in bad faith. App. 119-20; R.Doc. 22-3, at 85-86.

MMIC then reneged on its promise to pay the clinic's bankruptcy bills. App. 39; R.Doc. 9, at 10. After initially appealing the bankruptcy court's decision to the

Appellate Case: 25-1758     Page: 22     Date Filed: 02/09/2026 Entry ID: 5606188

district court, the clinic—facing hundreds of thousands of dollars in unpaid fees—voluntarily dismissed its appeal. *Id.*

### 3. After a confidential mediation raises the possibility of settlement between the clinic and S.K., MMIC rushes to federal court to stop it.

The clinic, once again unprotected from collection efforts, hired its own attorney, Nicholas Rowley, to protect its interests during the appeal. Add. 4; App. 234; R.Doc. 89, at 4. In June 2023, Mr. Rowley—along with counsel for the other parties—attended a one-day mediation session before retired federal Judge Mark Bennett. App. 121-24; R.Doc. 22-3, at 92-95. MMIC's counsel attended but once again made no settlement offer, instead taking the position that the clinic would prevail on appeal. App. 123; R.Doc. 22-3, at 94. Judge Bennett spent about half an hour with Mr. Rowley and S.K.'s counsel, discussing the possibility of a settlement that would include dismissal of the direct appeal pending in the Iowa Supreme Court. App. 121-22; R.Doc. 22-3, at 92-93. But although Mr. Rowley reported "a lot of progress" in the discussions, he told MMIC in an email that no settlement had been reached. App. 121; R.Doc. 22-3, at 92. If the company wanted to settle S.K.'s claim, he wrote, it would have to "talk[] to the Plaintiffs" instead. App. 122; R.Doc. 22-3, at 93.

Rather than doing so, MMIC filed this case in federal district court. In a complaint filed two business days after the mediation, the company alleged that it had "learned there have been discussion(s) between [S.K.] and the Clinic about

dismissing the direct appeal" in the Iowa Supreme Court. App. 21; R.Doc. 1, at 8. Such a dismissal, it alleged, "would violate the Clinic's obligation to permit MMIC to control the defense of the claim," as well as its "the obligation to refrain from, except at its own expense, admitting liability or incurring any obligation to the claimant." *Id.* MMIC asked "for relief only insofar as it would allow an unimpeded legal process to play out," including "an order enjoining the Clinic from dismissing … or otherwise interfering with … the Iowa Supreme Court's decision," and a declaration that any such interference "would violate the terms of the Policy, would foreclose the filing of a bad faith cause of action (or any other claim) against MMIC, and would also void the Policy *ab initio*." App. 21, 22; R.Doc. 1, at 8, 9.

In its answer, the clinic denied that it had "'threatened' to dismiss the appeal." App. 40; R.Doc. 9, at 11. It told the district court that, although it had "no current agreement or plan to dismiss," it should "be allowed to negotiate with S.K. and his lawyers" to protect its interests. App. 43, 45; R.Doc. 9, at 14, 16. Rather than enjoining those efforts, it asked the court to find that MMIC had "already breached the insurance contract by unreasonably refusing to make any efforts to settle within policy limits." App. 42; R.Doc. 9, at 13. The insurance company, the clinic explained, had "controlled the defense of the underlying claim in bad faith and breached the insurance contract" when it "refused to pay anything within the policy limits to settle

this case," and "repeatedly and materially put its financial and political interests ahead of its insureds." App. 31; R.Doc. 9, at 2.

**4. With MMIC still refusing to negotiate settlement, the clinic sues the insurance company and its lawyers for their bad-faith failure to settle, and separately moves to protect its rights in the Iowa Supreme Court.**

When, over the following months, MMIC continued to resist any settlement, the clinic filed suit in state court against the company and its counsel for bad faith and legal malpractice, alleging that they had, without justification, "refus[ed] to settle the case for an amount of money that was within the limits of the available insurance policy." App. 128; R.Doc. 22-3, at 140. The complaint reiterated the clinic's allegations that both it and S.K. "wanted the case settled" and had repeatedly requested that MMIC attempt to settle within policy limits. App. 128-29; R.Doc. 22-3, at 140-41. But "[d]espite these clear and unequivocal requests," MMIC and its counsel had each time "refused to negotiate or offer anything to resolve the underlying claim." App. 129; R.Doc. 22-3, at 141. Rather than working to resolve the case, the clinic alleged, MMIC was content to use the large verdict and the clinic's bankruptcy as ammunition in its lobbying efforts for tort reform in the state. *Id.*

Shortly after, Mr. Rowley filed his appearance in the Iowa Supreme Court on behalf of the clinic and moved to stay the appeal and oral argument to allow time for settlement negotiations between it and S.K. The clinic told the Court that, despite the significant risk of a verdict above policy limits, the insurance company and its

15

counsel still "refused to offer a single dollar." App. 147; R.Doc. 22-3, at 161. But it predicted that, if the Court gave the parties "the time they need to work to resolve this matter," there was "a high probability that a settlement [would] be reached." App. 146, 149; R.Doc. 22-3, at 160, 163. The clinic assured the Court that, "[i]f such an agreement is reached," it would be presented to a court for approval before going into effect. App. 186; R.Doc. 22-3, at 218. In a separate filing, the clinic also objected to the appearance of Mr. Booher as the clinic's counsel, telling the Court that it had never "consented to be represented by" him in the appeal, nor had it even "met with" or "spoken to" him. App. 153; R.Doc. 22-3, at 169.

The Iowa Supreme Court granted the motion to stay oral argument, ordering the parties to file a status report on settlement negotiations within sixty days. Add. 6; App. 236; R.Doc. 89, at 6. Once the case was stayed, the clinic emailed Mr. Booher "to clarify any possible conflicts of interest" and ensure that he was "not conflicted by loyalties to MMIC." App. 48; R.Doc. 19-1, at 1. In the email, the clinic's counsel complained that MMIC's refusal "to offer any money … within policy limits" had inappropriately "put its financial interests ahead" of the clinic's. *Id.* "If you can help ensure that the doctors and the Clinic are fully protected and their financial interests are not compromised," he wrote, "then I look forward to your staying on this team." App. 49; R.Doc. 19-1, at 2.

16

Mr. Booher responded that, "[g]iven the history and posture of this case, as well as the various ongoing disputes, it [was] understandable that the doctors and Clinic would want to know more before signing off on [him] presenting the oral argument." App. 50; R.Doc. 19-2, at 1. While taking no position on settlement, Mr. Booher "assure[d] the doctors and Clinic that [his firm's] loyalties [were] and have been to them," "not MMIC." *Id.*

### 5. MMIC interferes with the clinic's settlement attempts and moves for summary judgment.

Despite those assurances, MMIC continued to aggressively block efforts by the clinic and S.K. to reach settlement. The company, over the clinic's objection, moved to intervene in the Iowa Supreme Court, asking the court to lift the stay and overrule the clinic's objection to Mr. Booher's representation. App. 171; R.Doc. 22-3, at 197. In resisting the motion, the clinic explained that maintaining the stay would permit it to explore settlement options "free from the conflicting interests of its insurer." App. 195-96; R.Doc. 22-3, at 227-28.

While that motion was pending in the state-court appeal, MMIC also moved for summary judgment in its federal case. Rather than asking the district court just to allow the Iowa Supreme Court appeal to play out, as it had in its complaint, the company now asked for a declaratory judgment holding that the clinic had *already* breached the policy, that the policy was now void, and that "any and all causes of action" on the policy were "foreclosed." App. 54-55; R.Doc. 22, at 1-2.

17

Although the clinic and S.K. continued to "engage[] in discussions to resolve the underlying dispute," MMIC's motions and continuing legal threats frustrated settlement efforts. *See* App. 212-15; R.Doc. 27-3, at 7-10. At the end of the sixty-day stay period in the Iowa Supreme Court, with settlement seeming increasingly unlikely in the near term, the clinic reluctantly withdrew its objection to Mr. Booher's representation and moved to lift the stay. App. 216-17; R.Doc. 27-3, at 12-13. With all parties now in agreement, the Supreme Court granted the motion and rescheduled oral argument—leaving MMIC in the same position (but for a delay) in which it would have been had the clinic's filings never been made.

### 6. MMIC prevails on appeal in the Iowa Supreme Court and on summary judgment in the district court.

In April 2024, the clinic informed the district court that it had reached a "tentative settlement" with S.K. App. 219-20; R.Doc. 32, at 1-2. Again, Mr. Rowley insisted on court approval, and that's what the tentative settlement required, providing that, until that approval was obtained, "neither party [was] bound" by the agreement's terms. App. 227-28; R.Doc. 32-1, at 7-8. The clinic asked the court to postpone the impending hearing on summary judgment so that it could "submit the proposed agreement to this Court for review and approval." App. 219; R.Doc. 32, at 2. The district court denied the motion the same day. App. 9; R.Doc. 33.

After hearing argument on summary judgment, the district court continued trial until after resolution of the clinic's state-court appeal. R.Doc. 71. The Iowa

18

Supreme Court held argument in that appeal, at which Mr. Booher appeared on the clinic's behalf—just as MMIC had asked. Add. 18; App. 248; R.Doc. 89, at 18. In November 2024, the Iowa Supreme Court issued a decision reversing the jury's verdict and ordering a new trial on the ground that the trial court had erroneously admitted hearsay evidence. *See* R.Doc. 81-2. Again, MMIC got exactly what it wanted.

Nevertheless, the district court granted summary judgment to MMIC, holding that "a series of actions" taken by the clinic were "at odds with its contractual obligations" and required that it be stripped of coverage altogether. Add. 1; App. 231; R.Doc. 89, at 1.

*First*, the court held that the clinic had materially breached MMIC's contractual right to "control the defense of and retain an attorney to defend any claim" when, citing a conflict of interest, it temporarily withdrew consent for Mr. Booher to represent it on appeal, and when it sued trial counsel in state court for malpractice. Add. 17-18; App. 247-48; R.Doc. 89, at 17-18. Although the policy did not require the clinic's consent to conflicted counsel or prohibit it from asserting a legal-malpractice claim, the court held that the "timing of these maneuvers reveal[ed] a deliberate attempt to obstruct the appellate process rather than a legitimate concern about representation." Add. 19; App. 249; R.Doc. 89, at 19. And although the clinic later withdrew its objection—and, represented by Mr. Booher, ultimately prevailed

in the Iowa Supreme Court—the court held that the "delay in the appellate process" had "caused actual prejudice to MMIC." Add. 20; App. 250; R.Doc. 89, at 20. The court, however, did not identify any actual harm that MMIC suffered from the delay.

*Second*, the court held that the clinic had violated the policy's provision that "[t]he insured must not, except at the insured's own expense, make any payment, admit any liability or incur any obligation other than reasonable medical expenses." *Id.* Even though no binding agreement was ever reached, the court held that the clinic's "*intent* to settle the underlying case," combined with its attempt to prosecute a bad-faith claim against MMIC, showed "a deliberate strategy to undermine MMIC's contractual rights"—thus violating the policy as a matter of law. Add. 22; App. 252; R.Doc. 89, at 22.

*Third*, the court cited a handful of additional actions that it held to be material breaches of the clinic's contractual duty to "cooperate" with MMIC's direction of the litigation. Add. 23-26; App. 253-56; R.Doc. 89, at 23-26. Those included the clinic's decisions to (temporarily) stay the case in the Iowa Supreme Court and to (also temporarily) oppose MMIC's motion to intervene in that appeal. Add. 23-24; App. 253-54; R.Doc. 89, at 23-24. The court also relied on the clinic's filing in the public docket of "privileged attorney work product" about Mr. Booher's appellate strategy—though the privilege was the clinic's to waive and the disclosure, in any event, had no effect on the outcome of that appeal. Add. 24-25; App. 254-55; R.Doc.

89, at 24-25. And it cited additional acts—including the clinic's alleged "misrepresentations to law enforcement," out-of-court statements criticizing MMIC, and dismissal of its bankruptcy appeal—that had nothing to do with the insurance policy and did not prejudice the insurance company in any relevant way. Add. 25-26; App. 255-56; R.Doc. 89, at 25-26. Once again, the contract's plain language did not prohibit any of these actions, but the court viewed the clinic's conduct "holistically" to discern a "pattern" of "systematic non-cooperation." Add. 27; App. 257; R.Doc. 89, at 27.

For those reasons, the court granted summary judgment to MMIC, holding as a matter of law that the clinic had "materially breached the Policy, rendering [it] void," and that "[a]ny and all causes of action on the Policy are now foreclosed." Add. 34; App. 264; R.Doc. 89, at 34. MMIC then announced that it would no longer pay for the clinic's defense, leaving the clinic without representation. App. 269; R.Doc. 92-2, at 1.

## SUMMARY OF ARGUMENT

The district court erred in granting summary judgment to MMIC and declaring the clinic's insurance policy void. The court identified no policy provision that the clinic actually violated, drew adverse inferences against the nonmovant on disputed questions of intent and motive, and voided the policy despite the absence of any actual prejudice to the insurer. Under Iowa law, only a material breach that

causes real harm can excuse an insurer's performance, and total forfeiture of coverage is an extraordinary remedy reserved for the most serious violations. The district court's contrary holding finds no support in Iowa precedent and cannot be reconciled with the state's strong public policies in favor of protecting insureds and avoiding conflicts of interest in the legal profession.

**I.** The clinic did not materially breach the policy by temporarily objecting to representation by conflicted counsel. The policy gave MMIC the right to retain counsel—which it did, all the way through oral argument in the Iowa Supreme Court. Nothing in the policy's text required the clinic to accept counsel with a material conflict of interest, and Iowa's ethics rules make clear that the clinic had every right to question whether MMIC's hand-picked counsel could represent it given the sharply divergent interests between insurer and insured. The clinic's sixty-day objection caused no prejudice: MMIC's chosen counsel ultimately argued the appeal, and the clinic prevailed. At most, the objection caused a brief delay in a case already on appeal—a delay that the Iowa Supreme Court itself authorized by granting the clinic's motion to stay.

**II.** The clinic did not materially breach the policy by engaging in nonbinding settlement discussions. The policy explicitly permitted the clinic to settle "at [its] own expense," and that necessarily included the right to negotiate. No settlement was ever consummated, no agreement was ever binding, and MMIC—which steadfastly

refused to settle despite repeated requests—suffered no interference with settlement negotiations it never attempted. The district court cited no Iowa cases finding prejudice from unconsummated settlement discussions, and the cases it did cite all involved final settlements that bound the insurer without notice or consent.

**III.** The clinic did not materially breach the cooperation clause or thereby prejudice MMIC. That clause required the clinic to cooperate in MMIC's investigation and defense, but MMIC never asked for the clinic's cooperation before filing this lawsuit. The district court's laundry list of alleged violations—filing court papers, waiving privilege that belonged to the clinic, making public statements, and dismissing a bankruptcy appeal—consisted largely of conduct outside the litigation that had nothing to do with the policy's terms. None of these actions violated the policy's language, none were material, and none prejudiced MMIC's successful defense and appeal.

**IV.** Even assuming that the clinic technically breached some policy term, and did so in a way that caused some proven prejudice, the district court erred in granting the most extreme form of relief. Iowa courts disfavor forfeitures—particularly in the insurance context—and permit discharge of a party's contractual duties only when the breached condition was the core of the agreed exchange or was expressly identified as a condition of performance. Because MMIC ultimately received full performance under the policy, it suffered no compensable injury and was entitled to

23

no relief—much less a windfall that leaves it in a better position than if the contract had been fully performed.

## STANDARD OF REVIEW

This Court reviews a grant of summary judgment de novo. *First Colony Life Ins. Co. v. Berube*, 130 F.3d 827, 829 (8th Cir. 1997). The Court likewise reviews de novo a district court's application of state law in a diversity case. *See id.*

## ARGUMENT

A federal district court's evaluation of a motion for summary judgment in a diversity case like this one is governed by two guiding principles. On the facts, the role of a district court at the summary-judgment stage is to "determine[] whether there is a genuine issue for trial," not to "weigh the evidence or determine the truth of the matter." *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 608 (9th Cir. 2019). On the law, the role of a federal court sitting in diversity "is to interpret state law, not to … expand [it] in ways not foreshadowed by state precedent." *Arena Holdings Charitable, LLC v. Harman Pro., Inc.*, 785 F.3d 292, 298 n.3 (8th Cir. 2015).

The district court here violated both principles. The court identified no Iowa decisions holding that *any* of the clinic's actions were capable of materially breaching MMIC's rights under the insurance contract, or holding that a temporary objection to appellate counsel or a delay in a successful appeal is prejudicial. Indeed, neither MMIC nor the district court identified a decision of *any* court in the nation, let alone in Iowa, that had voided an insurance policy under circumstances anywhere close to

24

these. And in granting summary judgment to MMIC, the court went beyond a determination of whether the evidence presented a "genuine issue for trial"—instead piling inference upon inference to discern a "calculated strategy to frustrate the appeal process." Add. 18; App. 248; R.Doc. 89, at 18. Despite the district court's inferences regarding what it saw as the clinic's "suspicious" behavior, none of the supposed breaches that the district court identified violated the policy's plain language, much less constituted a material breach of the policy's terms.

## I. The clinic did not materially breach the policy by temporarily withdrawing its consent to legal representation—much less did it cause actual prejudice to MMIC in doing so.

**A.** The district court first held that the clinic, as a matter of law, materially breached MMIC's policy terms when it temporarily withdrew its consent for the insurance company's chosen appellate counsel (Mr. Booher) to represent the clinic at oral argument before the Iowa Supreme Court. But under both the terms of MMIC's insurance policy and the Iowa Rules of Professional Conduct, the clinic had every right to do so. There is nothing improper about an insured's decision to protect its own interests by declining the representation of a lawyer with a material conflict of interest.

Nothing in the insurance policy's plain language prohibited the clinic from taking that step. The policy gave MMIC the right to "retain an attorney to defend any claim." App. 75; R.Doc. 22-3, at 12. And that's exactly what the company did: It

"retain[ed]" counsel who "defend[ed]" against S.K.'s claim all the way to judgment in the trial court and on direct appeal—including at oral argument in the Iowa Supreme Court. Although the clinic initially objected to Mr. Booher's appearance at argument, it withdrew that objection after corresponding with him and "agreed that [he could] represent the [clinic] before [the] Court." App. 216; R.Doc. 27-3, at 12. MMIC thus got its choice of counsel at every stage of the case. The policy entitled it to nothing more.

Under Iowa law, an unambiguous insurance contract must be enforced as written, *Amish Connection, Inc. v. State Farm Fire & Cas. Co.*, 861 N.W.2d 230, 236 (Iowa 2015), giving "undefined words their ordinary meaning." *Grinnell Mut. Reinsurance Co. v. Jungling*, 654 N.W.2d 530, 536 (Iowa 2002). Ambiguity exists only when policy language "is susceptible to two *reasonable* interpretations." *Kibbee v. State Farm Fire & Cas. Co.*, 525 N.W.2d 866, 868 (Iowa 1994). Here, there is no such ambiguity: Nothing in the policy language can reasonably be read to suggest that the clinic's right to "retain counsel to defend" a claim is breached by a temporary objection to representation on appeal. But even if it were possible to read the policy that way, the language would at most be ambiguous. And under Iowa law "ambiguous policy provisions are interpreted in the light most favorable to the insured." *Am. Fam. Mut. Ins. Co. v. Corrigan*, 697 N.W.2d 108, 111 (Iowa 2005).

26

**B.** MMIC's right to "retain" counsel of its choice cannot reasonably be understood to allow it to force the clinic into representation by conflicted counsel. As explained above, the terms of an insurance contract "cannot change the public policy embodied in" state ethics rules—including the rules governing conflicts of interest. Pepper, *Applying the Fundamentals of Lawyers' Ethics to Insurance Defense Practice*, 4 Conn. Ins. L.J. at 38. And in Iowa, a "contract which contravenes public policy will not be enforced." *Wunschel L. Firm, P.C. v. Clabaugh*, 291 N.W.2d 331, 335 (Iowa 1980). Thus, the "attorney-client relationship, even if documented by a written agreement, is subject to ethical and professional court rules, and ordinary contract principles must yield to these ethical standards." *Padden L. Firm, PLLC v. Toyota Motor Corp.*, 956 F.3d 1069, 1073 (8th Cir. 2020) (applying Minnesota law); *see also Plummer v. McSweeney*, 941 F.3d 341, 348 (8th Cir. 2019) (holding that state rules of professional conduct that are an "expression of … public policy … can render a contract unenforceable").

It is thus the Iowa Rules of Professional Conduct—not the insurance policy—that "govern the lawyer's obligations to the insured," with the result that "the lawyer so employed [must] represent the insured as his client with undivided fidelity." ABA Formal Op. 96-403. Here, there was "a significant risk" that Mr. Booher's representation of the clinic was "materially limited by [his] responsibilities to [MMIC]." Iowa R. Prof'l Cond. 32:1.7. As the clinic told the district court, the record-setting judgment in the underlying medical-malpractice case left the clinic and

27

MMIC with significantly "differing and conflicting interests." The clinic—which was on the line for 84% of the $75.6 million judgment—had a strong incentive to accept a settlement at the $12 million policy limit, which would have fully eliminated its share of liability. But such a settlement would have held no interest for MMIC, which would have been stuck with the $12 million limit regardless, and would thus have been better off rolling the dice on even a slim chance of overturning the judgment in the Iowa Supreme Court. It is thus not surprising that the clinic and S.K. repeatedly pushed for a settlement within the policy limit, while MMIC insisted on taking its chances on appeal.

Given those conflicting interests, the Iowa Rules of Professional Conduct would have allowed Mr. Booher to represent the clinic only after obtaining its "informed consent" to the conflict. ISBA Comm. on Prof'l Ethics & Conduct, Formal Op. 98-08 (1998); *see* Iowa R. Prof'l Cond. 32:1.8, cmt. [12]; *see also Henke*, 87 N.W.2d at 924 ("[W]hen a conflict of interests arises" between two parties in a dual representation, the lawyer "must make full disclosures to both or terminate the relation of attorney and client."). MMIC could not possibly have obtained the clinic's informed consent here, given that Mr. Booher never advised the clinic of "the risks associated with an excess verdict" or "the impact such a verdict would have on [it]." App. 127-28; R.Doc. 22-3, at 139-40. Indeed, Mr. Booher did not contact the clinic at all until *after* the clinic had already objected to his representation in the Iowa

28

Supreme Court. App. 153; R.Doc. 22-3, at 169. And even if Mr. Booher had made the required disclosures, it would still have been up to the clinic—and the clinic alone— whether to consent to the conflicted representation. *See* Iowa R. Prof'l Cond. 32:1.7. By choosing instead to object, the clinic was simply exercising its right to impartial counsel. There was nothing improper about its decision to do so.

In adopting its conflict-of-interest rules, the Iowa Supreme Court balanced two important state interests: the right of a party "to choose his or her own attorney" and "the need to maintain the highest ethical standards that will preserve the public's trust in the bar and in the integrity of the court system." *Bottoms v. Stapleton*, 706 N.W.2d 411, 415 (Iowa 2005). By forcing parties to accept an insurer's preferred counsel—and by doing so even when that counsel's judgment is compromised by a conflict of interest—the district court did grave harm to these policies. While the Iowa Supreme Court has held that, when such a conflict develops, the "lawyer cannot and should not try to render further service or advice," *Henke*, 87 N.W.2d at 925, the district court here held that the clinic had no choice but to accept the conflicted representation on pain of losing coverage entirely. And while the Iowa Supreme Court made clear in *Henke* that "the lawyer hired by the insurer … must devote his or her professional loyalty, diligence, and independence of judgment to the insured client," 16 *Iowa Practice Series: Lawyer and Judicial Ethics* § 5:7(d)(6), the district court held that MMIC, as the insurer, controlled the objectives of the litigation—

including the critical decision whether to settle. In doing so, the district court ran roughshod over the Iowa Rules of Professional Conduct, including provisions requiring the insured's informed consent to the representation and prohibiting the insurer from "materially interfer[ing] with the lawyer's duty to exercise independent professional judgment." Iowa R. Prof'l Cond. 32:1.7, cmt. [13a].

To side with MMIC would thus require this Court to adopt a view of the lawyer's duties that differs markedly from the one adopted by the state's highest court. But this Court "is not an appellate court of [Iowa] and establishes no rules of law for that State." *Homolla v. Gluck*, 248 F.2d 731, 734 (8th Cir. 1957). The role of the federal courts "in diversity cases is to interpret state law, not to fashion it" or "expand [it] in ways not foreshadowed by state precedent." *Arena Holdings*, 785 F.3d at 298 n.3. "That is the end of [the] inquiry as a federal court sitting in diversity." *Salier v. Walmart, Inc.*, 76 F.4th 796, 802 (8th Cir. 2023). The district court erred by going further.

**C.** The district court had no answer to the clinic's point that "it was reasonable … to question whether [Mr. Booher] should represent it" in the Iowa Supreme Court. Add. 18; App. 248; R.Doc. 89, at 18. Even Mr. Booher agreed that, "[g]iven the history and posture of this case, as well as the various ongoing disputes, it [was] understandable that the doctors and Clinic would want to know more before signing off on [him] presenting the oral argument." App. 50 R.Doc. 19-2, at 1. Rather

30

than accepting that uncontroversial premise, however, the district court concluded—based on its own view of what inferences might be drawn from the record—that the clinic's objection was actually "part of a calculated strategy to frustrate the appeal process." Add. 18; App. 248; R.Doc. 89, at 18. It held, apparently as a matter of law, that the "timing of [the clinic's] maneuvers—particularly the withdrawal of consent for Attorney Booher after fourteen months without objection—reveal[ed] a deliberate attempt to obstruct the appellate process rather than a legitimate concern about representation." Add. 19; App. 249; R.Doc. 89, at 19.

The district court erred by adopting that inference against the clinic at this stage of the case. A court on summary judgment must view "the facts in the light most favorable to the nonmoving party and giving that party the benefit of all reasonable inferences that can be drawn from the record." *Johnson v. Wells Fargo Bank, N.A.*, 744 F.3d 539, 541 (8th Cir. 2014). Here, there was an obvious alternative inference to explain the timing of the clinic's withdrawal of consent. Shortly before oral argument was scheduled in the Iowa Supreme Court, MMIC's trial lawyers withdrew from the case, and Mr. Booher entered his appearance as the clinic's new lead counsel. App. 151; R.Doc. 22-3, at 165. Mr. Booher filed his appearance without first consulting the clinic (or even speaking with anyone there), and it was that filing that prompted the clinic—the very next day—to file its objection to Mr. Booher's

31

appearance. *See* App. 209; R.Doc. 27-3, at 4. There was nothing "suspicious" about it.

**D.** "Under Iowa law, only a *material* breach" can "excuse … nonperformance." *Ryan Data Exch., Ltd. v. Graco, Inc.*, 913 F.3d 726, 733-34 (8th Cir. 2019) (emphasis added). The district court erred in holding that the clinic's temporary objection to Mr. Booher's representation was such a material breach. The clinic's temporary withdrawal of consent to Mr. Booher's representation—even assuming the contract prohibited it—was not material because it did not deprive MMIC of any "benefit that it justifiably expected." *Van Oort Constr. Co. v. Nuckoll's Concrete Serv., Inc.*, 599 N.W.2d 684, 692 (Iowa 1999). As explained above, MMIC had no right to expect the clinic *ever* to consent to representation by counsel who was conflicted by a relationship with the insurer. Nor, having foisted Mr. Booher on the clinic as lead counsel shortly before oral argument, without disclosing the conflict or seeking informed consent, could MMIC have expected that the argument would still occur on the originally scheduled date with Mr. Booher in attendance.

The district court likewise erred in holding that MMIC suffered prejudice. Despite the clinic's initial objection to Mr. Booher, it ultimately consented to his representation and filed a motion to lift the stay. App. 216; R.Doc. 27-3, at 12 (representing that the clinic "has agreed that [Mr. Booher] can represent [it] before this Court"). As the district court acknowledged, oral argument was then

32

rescheduled, and Mr. Booher appeared on the clinic's behalf. Add. 19-20; App. 249-50; R.Doc. 89, at 19-20. Given that the clinic allowed Mr. Booher to represent it at oral argument, and that the clinic ultimately prevailed in that appeal, any breach (even if there was one) could not have caused it prejudice. The period between the clinic's objection to Mr. Booher and its withdrawal of that objection was, in total, only about sixty days, during which no briefing occurred and no hearings were conducted. No harm could have been done to MMIC's litigation strategy by that delay, and the district court cited no cases in which any Iowa court has found prejudice from a comparable temporary delay in court proceedings.[1]

Nevertheless, the district court held that the clinic's "belated acquiescence" to Mr. Booher's representation did "not remedy the prejudice caused by the clinic's earlier actions." Add. 20; App. 250; R.Doc. 89, at 20. The "delay in the appellate process" and "interference with MMIC's right to direct the litigation," the district

---

[1] The district court committed a separate error by putting the burden on the clinic to prove that MMIC did not suffer prejudice from the alleged breaches. It is true that "an insured's *substantial* breach of a condition precedent which is not excused or waived" is subject to a "rebuttable presumption of prejudice." *Met-Coil Sys. Corp. v. Columbia Cas. Co.*, 524 N.W.2d 650, 658 (Iowa 1994) (emphasis added). But none of the breaches that MMIC alleges—temporarily delaying the appeal with a two-month stay, participating in nonbinding settlement discussions, and engaging in the other miscellaneous conduct that MMIC identifies—was a "substantial" breach of the policy. Even if the policy prohibited those things at all (and it doesn't), they do not involve "basic and essential provisions" of the policy that go to "the very essence of the agreement"—and for which prejudice can therefore be presumed. *Henderson v. Hawkeye-Sec. Ins. Co.*, 106 N.W.2d 86, 92 (1960).

33

court wrote, "constitute[d] material breaches that have caused actual prejudice to MMIC." *Id.* Despite the court's claim to "actual evidence" of that prejudice, however, its decision identified no real-world harm from the delay. For example, the district court held that MMIC was prejudiced by being left "temporarily without counsel despite its contractual right to direct the defense." Add. 28; App. 258; R.Doc. 89, at 28; *see also, e.g.*, Add. 18; App. 248; R.Doc. 89, at 18 (concluding that the clinic "significantly disrupted the appellate process, delayed resolution of the appeal, and prejudiced MMIC's rights"); Add. 19; App. 249; R.Doc. 89, at 19 (concluding that the clinic caused "substantial delay and interfered with MMIC's contractual right to direct the defense and select counsel"). But the court failed to explain how this brief lapse in appellate counsel prejudiced MMIC, especially given that there was no briefing or argument during the stay period, and that the clinic ultimately prevailed on appeal.[2]

The district court's non-specific descriptions of harm establish, at best, "*potential* prejudice." *Michigan Millers Mut. Ins. Co. v. Asoyia, Inc.*, 793 F.3d 872, 879 (8th Cir. 2015) (emphasis added). But they "fail[] to show" that "any *actual* prejudice ever materialized." *Id.* The court's "speculation that prejudice to [the] insurer may exist"

---

[2] The district court also cited "duplicative preparation and additional expenditures when new counsel later needed to master the complex record." Add. 28-29; App. 308-09; R.Doc. 89, at 28-29. But there could have been no such prejudice here, given that the clinic reinstated Mr. Booher rather than bringing in new appellate counsel. App. 216; R.Doc. 27-3, at 12.

therefore did "not suffice to relieve the insurer of its liability wherein the lack of prejudice is clearly demonstrated." *Fireman's Fund Ins. Co. v. ACC Chem. Co.*, 538 N.W.2d 259, 266 (Iowa 1995). At the very least, the court should have reserved the prejudice issue for "the jury in weighing the evidence," not for itself. *Michigan Millers*, 793 F.3d at 879.

## II. The clinic did not materially breach the policy by engaging in nonbinding settlement discussions, nor was MMIC prejudiced by those discussions.

**A.** The district court next held that the clinic materially breached the policy's terms by engaging in "unauthorized settlement negotiations." Add. 20; App. 250; R.Doc. 89, at 20. The court asserted that the clinic's insurance policy "explicitly limit[ed] [its] authority to engage in settlement negotiations independent of MMIC." *Id.* But the clinic's policy included no such explicit limit. Instead, the provision on which the district court relied said the opposite: that the insured "must not, *except at the insured's own expense*, make any payment, admit any liability or incur any obligation." App. 72; R.Doc. 22-3, at 9 (emphasis added). The plain language of that provision unambiguously *authorizes* the clinic—albeit at its "own expense"—to settle independently of MMIC. And the clinic's authority to make an independent settlement necessarily carries with it the authority to *negotiate* that settlement as well—at least where, as here, the policy nowhere says that negotiations are prohibited.

35

By contrast, the policy does explicitly prohibit the *insurer* from "settl[ing] a claim … without the prior written consent of the policyholder." App. 79; R.Doc. 22-3, at 16; *see also* App. 75, R. Doc. 22-3, at 12 (granting the insurer the right to "investigate or settle any claim," subject "to the policyholder's right to consent"). But it includes no corresponding provision requiring consent for a settlement by the *insured*. That contractual distinction must be given effect. *See Chandler v. Iowa Dep't of Corr.*, 17 N.W.3d 645, 648 (Iowa 2025) ("[T]he express mention of one thing implies the exclusion of others not so mentioned.").

The court also relied on MMIC's policy provision requiring the insured to "fully cooperate" in the "negotiation of settlements." Add. 23; App. 253; R.Doc. 89, at 23. But that language only requires cooperation with the *insurer's* negotiation efforts. It cannot be read to also require the *insured* to obtain permission before independently negotiating a settlement. Otherwise, the provision's language would conflict with the contract's separate provision expressly authorizing the clinic to settle at its own expense—"thereby violating the rule against interpreting contract provisions to have no independent effect." *Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 728 n.3 (Iowa 2014). Even if there were some doubt, the policy must be "interpreted in the light most favorable to the insured" to allow the clinic to negotiate on its own behalf, at its own expense. *Am. Fam. Mut. Ins. Co.*, 697 N.W.2d at 111.

36

**B.** The clinic argued below that, even if it lacked authority to *enter* a settlement with S.K.'s lawyers, nothing in the policy's plain language prohibited it from at least *discussing* the possibility of settlement with them. The district court disagreed. The policy's "language requiring cooperation in 'the negotiation of settlements,'" the court held, was "not limited to final settlement agreements but encompass[ed] the entire settlement process." Add. 23; App. 253; R.Doc. 89, at 23. But even if the district court were correct that an insured can breach the policy's terms just by *talking* about settlement, any breach here would not be material because the clinic never reached a final agreement. Although the clinic and S.K. filed a *tentative* settlement in the district court, that agreement was expressly contingent on the court's approval. App. 227-28; R.Doc. 32-1, at 7-8. Absent that approval, "neither party [was] bound by the express or implied terms of [the] Agreement." *Id.*

Likewise, MMIC suffered no prejudice from the clinic's participation in settlement discussions, both because no binding settlement was ever reached and because the underlying judgment was reversed on appeal. The clinic's settlement efforts could not have prejudiced MMIC's own negotiations, given that MMIC never engaged in any such discussions. Although it had ample opportunity to pursue settlement (including at mediation), it consistently declined to do so. And the tentative settlement that the clinic filed in the district court "did not bind it to any finding of liability or judgment amount in the underlying lawsuit," leaving the insurer

37

with "the same ability to settle" as before. *Michigan Millers Mut. Ins. Co. v. Asoyia, Inc.*, 2014 WL 11513162, at \*6, \*9 (S.D. Iowa 2014). *Cf. Kelly*, 620 N.W.2d at 643 (holding that an insurer did not breach its policy by seeking a judicial determination of coverage).

The district court cited no Iowa cases finding prejudice based solely on an insured's *discussions* about settlement. The only decision that the court identified involved a *consummated* settlement agreement that bound the insurer without its participation or consent. *See Sargent v. Johnson*, 551 F.2d 221, 224 (8th Cir. 1977). Other Iowa Supreme Court cases finding prejudice based on an insured's settlement efforts feature similar facts. In *Simpson v. U.S. Fidelity and Guaranty Co.*, for example, the insurer received no notice of a "$600,000 confession of judgment until after [it was] filed in district court." 562 N.W.2d 627, 632-33 (Iowa 1997).

**C.** In any event, MMIC waived its right to demand the clinic's cooperation in settlement by consistently failing to honor the clinic's settlement requests. Where an insurance policy gives the insurer "control over the defense and over settlement," "a covenant of good faith and fair dealing is implied"—a covenant that "includes a duty to settle claims without litigation in appropriate cases." *Kelly*, 620 N.W.2d at 643. If the insurer breaches its duty to settle "by wrongfully rejecting a reasonable settlement offer, the insured may accept the settlement offer over the insurer's objection without breaching policy duties and losing his right to seek coverage." *Id.* at 639.

38

Here, the record demonstrates that the clinic faced potential liability far exceeding policy limits, App. 108; R.Doc. 22-3, at 74—a point confirmed by the jury's $97 million verdict. And the record is also clear that MMIC could easily have avoided that excess judgment if it had heeded the persistent requests of its insured. Before trial, the clinic and S.K. tried "to resolve the pending dispute for the policy limits of $12 million," but MMIC "refused to negotiate or make any settlement offer" despite the clinic's position. *Id.* That failure to settle formed the basis of the clinic's bad-faith claim in state court. App. 129; R.Doc. 22-3, at 141 (alleging that, despite "clear and unequivocal requests" by both parties, MMIC "repeatedly refused to negotiate or offer anything to resolve" the case).

MMIC's refusal to negotiate forced the clinic into trial and resulted in a judgment of more than six times the policy limit. *See* App. 108; R.Doc. 22-3, at 74. And that fact raises at least an issue of material fact about whether MMIC breached its duty to settle, thus allowing the clinic to enter an independent settlement over its objections. *See Kelly*, 620 N.W.2d at 645 (finding a triable issue of fact based on similar evidence).

## III. The clinic did not materially breach the cooperation clause or thereby prejudice MMIC.

The district court additionally cited a laundry list of miscellaneous conduct by the clinic that the court held violated the policy's requirement that the clinic "fully cooperate with [MMIC] in the investigation of claims, the negotiation of settlements,

39

and the conduct of litigation." App. 72; R.Doc. 22-3, at 9. All these alleged breaches suffer from a common flaw: MMIC never asked for the clinic's cooperation. To show a breach of a cooperation clause, an insurer must show that it exercised reasonable diligence in securing the insured's cooperation. *Bradley v. West Bend Mut. Ins. Co.*, 796 N.W.2d 455 (2003). The district court held that MMIC "undertook extensive, persistent, and reasonable efforts to secure the Clinic's compliance." Add. 29; App. 259; R.Doc. 89, at 29. But the very *first* effort that MMIC made, according to the district court, was to "proactively file[] this declaratory judgment action." *Id.* The "reasonable diligence" requirement is "an element in the determination of whether the insured has breached the cooperation clause." *Am. Guarantee & Liab. Ins. Co. v. Chandler Mfg. Co.*, 467 N.W.2d 226, 230 (Iowa 1991). If filing a lawsuit satisfied that element of the claim, the requirement would be trivially satisfied in every case.

In any event, none of these alleged breaches implicate a material breach of the policy's plain language; most involve non-litigation conduct that has nothing at all to do with the policy's terms. Moreover, the record here demonstrates that any breach of the cooperation clause, even assuming one occurred, was not material and could not have prejudiced MMIC because the company ultimately got its choice of counsel, the proposed settlement was never consummated, and the clinic prevailed on appeal.

40

***A. Litigation filings.*** MMIC first claims that the clinic breached its duty to cooperate by moving to stay oral argument in the Iowa Supreme Court to create an opportunity for settlement talks, and by resisting MMIC's attempt to intervene and lift the stay. The court identified no cases in Iowa—or anywhere else in the United States—in which a party was held to violate a cooperation clause merely because it filed litigation documents on a public docket.

If court filings in an insurance dispute like this one were enough to breach an insurance policy, parties who choose to litigate coverage issues would risk losing their insurance entirely. The Iowa Supreme Court has "reject[ed]" that extreme result. *See, e.g., Kelly*, 620 N.W.2d at 643 n.2 (rejecting the argument that "mere commencement of a declaratory judgment action constitutes a breach"); *McAndrews v. Farm Bureau Mut. Ins. Co.*, 349 N.W.2d 117, 119 (Iowa 1984) (holding that an insurer may seek a declaratory judgment to determine coverage). If the timing of such an action causes prejudice, "the remedy [is] to stay or dismiss the coverage suit"—not to void the entire policy. *Kelly*, 620 N.W.2d at 643.

Moreover, as noted above, a brief stay for the purpose of sorting out representation issues, if it can be considered a breach at all, is not a material breach. That the clinic was acting within its rights is apparent from the fact that the Iowa Supreme Court granted its motion, ordering the clinic to report on settlement negotiations within 60 days. Add. 6; App. 236; R.Doc. 89, at 6. If MMIC believed

that the Iowa Supreme Court's decision was wrong, its remedy was to ask that Court to reconsider its decision. A declaratory judgment action in federal district court is not the proper forum to second-guess the decision of the state's highest court as to the meaning of state law. *See, e.g., Ballinger v. Culotta*, 322 F.3d 546 (8th Cir. 2003).

Cases finding prejudice from a delay involved long delays that concretely prejudiced parties by causing them to lose access to witnesses and evidence. *See, e.g., Fireman's Fund*, 538 N.W.2d at 266 (finding prejudice from a five-year delay where, among other things, the "appearance of the site had been changed," "[a]t least one key witness had died," and "many relevant documents had been destroyed"); *Simpson*, 562 N.W.2d at 632-33 (finding prejudice where the insurer had "no opportunity to participate in, control, or monitor the litigation"; and "no opportunity to investigate the claim or assess its potential liability and damages"); *Bruns v. Hartford Acc. & Indem. Co.*, 407 N.W.2d 576, 580 (Iowa 1987) (finding that a twenty-eight-month delay denied insurance companies "access to potential witnesses," "immediate descriptions of the accident scene," "and the opportunity to inspect the vehicles involved").

Here, by contrast, the Iowa Supreme Court stayed the case for about two months, App. 216; R.Doc. 27-3, at 12, and the district court failed to identify any witnesses or evidence that were compromised as a result. That's not surprising: Because the case has previously been litigated all the way through judgment in the

Appellate Case: 25-1758    Page: 52    Date Filed: 02/09/2026 Entry ID: 5606188

trial court, MMIC has already had the opportunity to preserve evidence and witnesses. There's no reason to believe that the short two-month delay while the case was on appeal caused MMIC any real-world harm, such as a "witness actually being unavailable, or unable to remember details." *Michigan Millers*, 2014 WL 11513162, at *6.

**B. Work-product privilege.** The district court next held that the clinic breached its duty to cooperate when it "disclosed privileged attorney work product" by attaching an email from Mr. Booher to a public filing in this case. Add. 24; App. 254; R.Doc. 89, at 24; *see* App. 50-52; R.Doc. 19-2, at 1-3 (Booher email). But because privilege "belongs to the client, not the attorney," it is "the client's to waive." *In re Grand Jury Subpoena GJ2/00-345*, 132 F. Supp. 2d 776, 779 (S.D. Iowa 2000); *see also, e.g.*, *Henderson v. United States*, 815 F.2d 1189, 1192 (8th Cir. 1987) (holding that "the attorney-client privilege belongs to and exists solely for the benefit of the client"). Moreover, in the insurance context, the Iowa Supreme Court has "consistently held that when two or more parties consult an attorney for their mutual benefit," those communications are "not privileged in a later action between such parties." *Henke*, 87 N.W.2d at 618; *Brandon v. West Bend Mut. Ins. Co.*, 681 N.W.2d 633, 638 (Iowa 2004) (providing that the work-product doctrine does "not apply in a controversy between two parties who were jointly represented"). MMIC, as the party responsible for bringing this litigation, cannot now complain about the clinic's use of shared work product to defend itself.

43

Nor can MMIC claim prejudice from the disclosure. The district court asserted, without explanation, that the clinic's public filing of Mr. Booher's "confidential appellate strategy" could "prejudice the defense" by providing "insight into which issues MMIC's selected counsel viewed as vulnerable." Add. 25; App. 255; R.Doc. 89, at 25. That concern is not a plausible one: The email is written by appellate counsel and addresses almost exclusively *appellate* issues—such as the hearsay evidence issue on which the Iowa Supreme Court reversed—that have already been litigated and will almost certainly be irrelevant on remand. *See* App. 50-52; R.Doc. 19-2, at 1-3. The district court speculated that the email might nevertheless prejudice the clinic when it returns to the trial court for retrial. Add. 25; App. 255; R.Doc. 89, at 25. But the email's only reference to trial evidence is unequivocally favorable to the clinic. *See* App. 52; R.Doc. 19-2, at 3 (asserting that "[t]here is no evidence" that a clinic doctor knew about low blood pressure). There is simply no risk of prejudice here.

**C. Other conduct.** The remainder of the alleged breaches on which the district court relied all involve extraneous facts that have nothing to do with MMIC's policy and do not implicate the clinic's duty to cooperate:

- The district court concluded that Mr. Rowley, the clinic's retained counsel, made "material misrepresentations to law enforcement" when he told a sheriff's deputy, who was attempting to execute on the clinic's

44

assets after the verdict, that "[t]here's no such thing as a bad faith claim that you can collect." Add. 25; App. 255; R.Doc. 89, at 25.[3]

- The court also relied on the same counsel's public statement of his opinion that MMIC's involvement in the clinic's defense was "one of the worst cases of bad-faith conduct … in Iowa state history." Add. 26; App. 256; R.Doc. 89, at 26; App. 199; R.Doc. 22-3, at 234.

- The court cited the clinic's voluntary dismissal of its bankruptcy case, which "exposed [it] to execution" of the judgment. Add. 26; App. 256; R.Doc. 89, at 26.

Neither the district court nor MMIC have explained the relevance of any of these facts to an alleged breach of the policy's cooperation provision. Nor could they. The cooperation clause imposes a duty to cooperate only "in the investigation of claims, the negotiation of settlements, and the conduct of litigation." App. 72; R.Doc. 22-3, at 9. The court identified nothing in the contract's language that would entitle MMIC to also demand cooperation from the clinic in its public or private speech, or that would allow the company to force the clinic to file for and remain in bankruptcy against its will. App. 114 n.49; R.Doc. 22-3, at 80 n.49 (bankruptcy court's observation that the bankruptcy "appear[s] to fall outside the policy terms"). Much less did the court explain how these alleged breaches were material or how they prejudiced MMIC. *See McClune v. Farmers Ins. Co., Inc.*, 12 F.4th 845, 849 (8th Cir. 2021).

---

[3] MMIC's statement of uncontested facts quotes this statement but never claims that it was false. App. 66-67; R.Doc. 22-2, at 11-12. A bad-faith claim is an inchoate right; there is no way it can be "collected" in person by a deputy.

Instead, the court viewed the clinic's actions "holistically" to find a "pattern … of systematic non-cooperation," Add. 27; App. 257; R.Doc. 89, at 27—an approach that the court repeatedly relied on throughout its decision. *See, e.g.*, Add. 18; App. 248; R.Doc. 89, at 18 (finding a "calculated strategy to frustrate the appeal process"); Add. 18-19; Add. 248-49; R.Doc. 89, at 18-19 (concluding that the clinic's "timing strongly suggests [that its] actions were coordinated to disrupt the appeal process and delay oral argument"); Add. 19; App. 249; R.Doc. 89, at 19 (finding that the "timing of [the clinic's] maneuvers … reveals a deliberate attempt to obstruct the appellate process rather than a legitimate concern about representation"); Add. 20 n.2; App. 250 n.2; R.Doc. 89, at 20 n.2 (asserting that "[t]he timing of the lawsuit, along with the totality of the Clinic's conduct in the Appeal process, is suspicious"); Add. 22; App. 252; R.Doc. 89, at 22 (concluding that the clinic's "actions reflect … a deliberate strategy to undermine MMIC's contractual rights"); Add. 25; App. 255; R.Doc. 89, at 25 (stating that the clinic's "inconsistent positions evidence a pattern of tactical maneuvering rather than good-faith cooperation"). A contract, however, cannot be breached "holistically"; there must be a "breach of the contract in some *particular way*." *Royal Indem. Co. v. Factory Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010) (emphasis added). It was thus not a breach of contract for the clinic to pursue two or more courses of action that the contract separately allows—no matter how suspicious the district court deemed them to be.

46

The district court's "holistic" approach also cannot be reconciled with the well-established rule in Iowa that ambiguities in insurance contracts must be construed in favor of the insured. *See Am. Fam. Mut. Ins. Co.*, 697 N.W.2d at 111. And the court's liberal use of inferences to characterize the clinic's conduct as "calculated" or "suspicious" is likewise inconsistent with the familiar rule on summary judgment that facts must be viewed "in the light most favorable to the nonmoving party" and with the "benefit of all reasonable inferences that can be drawn from the record." *Johnson*, 744 F.3d at 541. The "drawing of legitimate inferences from the facts are jury functions, not those of a judge." *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). The court erred by taking that authority for itself.

## IV. The district court erred by adopting the extreme remedy of voiding the clinic's entire policy.

**A.** Even assuming the clinic made a misstep that amounted to a technical breach of a policy term, and even assuming that this breach was somehow material and caused prejudice, the remedy that the district court granted was extraordinarily overbroad. By voiding the entire liability policy, the court effectively spelled the end of the clinic by leaving it on the hook not only for S.K.'s claims—which have already produced a historic $97 million verdict and will now be retried—but for "[a]ny and all" other claims brought during the policy period. Add. 34; App. 264; R.Doc. 89, at 34. And as the district court acknowledged, that remedy is also a "tragic result" for

47

S.K., a severely brain-damaged child, because it permanently takes off the table "the only assets [that S.K.] could get" to pay for his necessary lifelong care. Motion TR. 39.

The district court erred by granting such extreme relief. The Iowa Supreme Court has long held that "'forfeitures are not favored in law, and courts will so construe contracts as to avoid them, if possible.'" *Lane v. Crescent Beach Lodge & Resort, Inc.*, 199 N.W.2d 78, 81 (Iowa 1972). That principle is particularly relevant to insurance contracts, which are "strongly construed against the insurer and in favor of the insured, especially where forfeiture is involved." *Parker v. Iowa Mut. Tornado Ins. Ass'n*, 260 N.W. 844, 846 (1935). Accordingly, to hold that one party's breach discharged another from an insurance contract requires showing that "the condition breached constituted the entire agreed exchange by the other party, or was expressly recognized in the bargain as a condition for the other's performance." *Union Story Tr. & Sav. Bank v. Sayer*, 332 N.W.2d 316, 322 (Iowa 1983). Far from meeting those stringent conditions, the district court voided the policy based on alleged breaches that do not implicate the policy's express language at all, much less constitute material violations.

MMIC's remedy for the clinic's alleged breach is therefore, at best, limited to damages. *See id.* And the damages that MMIC may recover are limited "to the loss [it] has *actually suffered by reason of the breach*." *Midland Mut. Life Ins. v. Mercy Clinics,* 579 N.W.2d 823, 831 (Iowa 1998). "Under Iowa law, when a contract has been breached

48

the nonbreaching party is generally entitled to be placed in as good a position as [it] would have occupied had the contract been performed." *Id.* (citing Restatement (Second) of Contracts § 344(a)). Here, MMIC already received full performance on the contract when the clinic abandoned settlement efforts, accepted representation by Mr. Booher, and ultimately prevailed on appeal. The company therefore has not suffered any harm and is not entitled to any relief. Much less is it entitled to a judgment voiding the entire policy, which leaves MMIC in "a better position than [it] would have been in if the contract had not been broken." *DeWaay v. Muhr,* 160 N.W.2d 454, 459 (Iowa 1968).

**B.** In reaching the opposite conclusion, the district court relied on the Iowa Supreme Court's holding in *Henke* that an insured "may reject [the insurer's] attorney and thus relieve the insurer from the obligation [to defend.]" Add. 19; App. 249; R.Doc. 89, at 19 (quoting *Henke,* 87 N.W.2d at 923). But the district court misread that holding. *Henke* never held that rejecting the insurer's attorney breached the insurance policy, much less that the breach justified voiding the entire policy. To the contrary, *Henke* made clear that "[n]othing in the policy compel[led] the insured … to accept the attorney selected by the insurer." 87 N.W.2d at 923. The Court held only that the insured's decision to reject the insurer's attorney would "relieve the

49

insurer from the obligation" to defend *in that case*—not, as the district court held here, that it would void the entire policy for "[a]ny and all" claims. *Id.*[4]

The district court also relied on *Dolly Investments, LLC v. MMG Sioux City, LLC*, 984 N.W.2d 168, 177 (Iowa 2023), for the proposition that, once "a material breach has been established," "the non-breaching party is typically relieved of its obligation to continue performing." Add. 17; App. 247; R.Doc. 89, at 17. By doing so, the district court fell into the very "confusion" that *Dolly Investments* was attempting to clear up. 984 N.W.2d at 177. As the Iowa Supreme Court explained there, material breaches sometimes, but "not always," "result in a discharge of the injured party's contract duties." *Id.* The Court looks to section 242 of the Restatement (Second) of Contracts, which provides that—unless the contract specifies otherwise—"a material breach does not automatically discharge the injured party's obligation," but only "*temporarily suspends* the injured party's duty to perform." *Dolly Invs.*, 984 N.W.2d at 177 (emphasis added); *see* Restatement (Second) of Contracts § 242 (A "party's uncured material failure to perform … has the effect of suspending the other party's duties."). Only

---

[4] Of course, rejection of the insurer's attorney may lead to disputes about whether the insurer remains responsible for the costs of defense and settlement. For example, the district court cited *Flexi-Van Leasing, Inc. v. Travelers Indemnity Co.*, in which the Fourth Circuit held that the insured was not entitled to indemnification for attorneys' fees where it fired the insurer's counsel "before an actual conflict arose." 837 F. App'x 141, 147 (4th Cir. 2020). There is no such dispute here, given that the clinic ultimately accepted Mr. Booher's representation and deferred to MMIC's defense and settlement strategy.

when "the materially breaching party does not cure," and it becomes "too late for the first party to perform," is the other party discharged. *Dolly Invs.,* 984 N.W.2d at 177.

That rule means that MMIC was, at most, only temporarily relieved of its contractual obligations while the clinic was objecting to Mr. Booher's representation and pursuing settlement on its own. By ignoring that rule and declaring the clinic's policy void at the first sign of an alleged breach, the district court's rule stuck the clinic with tens of millions of dollars of liability just for taking reasonable steps to protect its interests. No Iowa decisions have adopted that draconian result, and this case should not be the first.

## CONCLUSION

This Court should reverse the district court's grant of summary judgment to MMIC.

Respectfully submitted,

*/s/ Deepak Gupta*
DEEPAK GUPTA
JONATHAN E. TAYLOR
GREGORY A. BECK
GUPTA WESSLER LLP
2001 K Street, NW
Suite 850 North
Washington, DC 20006
(202) 888-1741
deepak@guptawessler.com
jon@guptawessler.com
gregory.beck@gmail.com

NICHOLAS C. ROWLEY
DOMINIC PECHOTA
CLINTON EHRLICH
TRIAL LAWYERS FOR JUSTICE
421 West Water Street
Decorah, IA 52101
(563) 382-5071

February 6, 2026                    *Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,992 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

February 6, 2026

*/s/ Deepak Gupta*
Deepak Gupta

## CERTIFICATE OF SERVICE

I hereby certify that on February 6, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Eighth Circuit by using the CM/ECF system. All participants are registered CM/ECF users and will be served by the CM/ECF system.

*/s/ Deepak Gupta*
Deepak Gupta